## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TYLER ALIPERTO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BARNES & NOBLE COLLEGE BOOKSELLERS, LLC; BARNES & NOBLE EDUCATION, INC.; CENGAGE LEARNING, INC.; FOLLETT HIGHER EDUCATION GROUP; MCGRAW HILL LLC; and PEARSON EDUCATION, INC.,<br><br>Defendants. | Case No.:<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Tyler Aliperto ("Plaintiff"), brings this action on behalf of himself and all others similarly situated against the dominant publishers of college and graduate school textbooks, Cengage Learning, Inc. ("Cengage"), McGraw Hill LLC ("McGraw"), and Pearson Education, Inc. ("Pearson," collectively, the "Publisher Defendants"), and against the dominant operators of official on-campus bookstores, Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc. (collectively, "B&N"), and Follett Higher Education Group, Inc. ("Follett", collectively with B&N the "Retailer Defendants").

### INTRODUCTION

1.     The market for higher education textbooks and course materials (collectively "course materials") is substantial.  The average college student spends $1,200 per year on these

items, representing nearly $3 billion in annual spending for students awarded federal financial aid.

2.      The Defendants are the dominant publishers of college textbooks and course materials and the dominant retail chains operating on-campus college bookstores. Facing declining profits, the Defendants entered into "Inclusive Access" agreements in order to monopolize the market for sales of course materials in any courses and on any colleges in which the Inclusive Access policy applies. These Inclusive Access agreements incentivized institutions to enforce a *de facto* requirement that Plaintiff and Class Members purchase course materials only from the Publisher Defendants and/or Retailer Defendants. They further effectively require students to purchase their course materials only in an online format and only from their official on-campus bookstore. Instead of students being instructed to buy a specific textbook for a class, from any source and in any format, students in an Inclusive Access course are required to pay for electronic access to the textbook, at the designated price, from their own official on-campus bookstore.

3.      Before Inclusive Access, Class Members could purchase their course materials from a variety of sources. For example, off-campus and online bookstores and sellers, including sites like Amazon and Chegg, offered opportunities to trade, rent, or purchase print or digital course materials at lower costs than those charged at the official campus bookstore. There was also a vibrant secondary market for used Course Materials. These varied options of sellers and formats created competition for traditional publishers which saved students money. However, Inclusive Access limits supply and choice, prevents the Defendants from facing competition, and costs students money.

4.      Defendants' monopolizing the market for the sale of course materials in Inclusive Access courses has allowed them to charge higher prices for those course materials with no legitimate pro-competitive justification, to the detriment of college and graduate students.

5.      Inclusive Access increases students' costs and eliminates their choices in order to increase the profits of textbook publishers and on-campus college bookstore retail chains.

6.      The Publisher Defendants use Inclusive Access to require every student in an Inclusive Access course to pay for electronic access to the course textbook.  Without Inclusive Access, many students would purchase a used version of the textbook on the secondary market, and the Publisher Defendants would not receive any money from those sales.

7.      The Retailer Defendants, who run a majority of all official on-campus college bookstores in the United States, use Inclusive Access to require students to make the Inclusive Access textbook purchases from their own on-campus bookstore.  Without Inclusive Access, students could buy print or electronic textbooks from competing sources, and the Retailer Defendants would not receive any money from those sales.

8.      The Publisher Defendants refuse to sell Inclusive Access materials to any retailers other than official on-campus bookstores.  If off-campus and online retailers were allowed to sell Inclusive Access materials to students, that competition would reduce prices.  This exclusionary policy prevents competition and keeps prices high.

9.      Students effectively have no other choice than to purchase Inclusive Access materials at the designated price from their official on-campus bookstore.  Reading assignments, homework problems, and quizzes are part of the official Inclusive Access course materials, and so while students can technically "opt-out" of the purchase under federal law, a student who does so would be at a massive disadvantage due to not being able to access those required course

materials.   Many colleges require a student who opts out to show proof of purchasing the materials from another source (and as mentioned above, they are generally not available from other sources).

10.    At many colleges using Inclusive Access, students in Inclusive Access courses are automatically signed up for the Inclusive Access course materials and automatically charged for them on their tuition bills.

11.    Students using Inclusive Access pay higher prices, are forced to purchase electronic course materials even if they prefer print, and they receive access to online course materials with an expiration date as opposed to being able to save course materials for future reference or sell them for money after the class is over.   Instructors have to waste class time explaining how to use the online course materials, and technical problems or broken Internet connections can result in students losing access to the materials.

12.    The Publisher Defendants' and Retailer Defendants' actions in conspiring to create the Inclusive Access system, requiring students to purchase Inclusive Access from only their official on-campus bookstores, and refusing to sell Inclusive Access materials to other retailers, all in order to monopolize the market for course materials in Inclusive Access classes and thereby raise prices, are actionable violations of the federal antitrust laws.   Plaintiff seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

## JURISDICTION AND VENUE

13.     Plaintiff brings claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

14.     This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims herein occurred in this District, and in the alternative, under 28 U.S.C. § 1391(b)(3), as this court would have personal jurisdiction over Pearson and B&N, who are inhabitants of, and transact business in, this District.

16.     This Court has personal jurisdiction over each Defendant because at least one Defendant has its principal place of business in this District.  The Court also has personal jurisdiction over each Defendant because each Defendant transacts substantial business in this District and has committed acts in furtherance of the conspiracy in this District, including establishing Inclusive Access programs at New Jersey universities.

## INTERSTATE COMMERCE

17.     Defendants' actions have had a significant effect on interstate commerce in the college textbook field.

18.     B&N has on-campus college bookstores in 43 states.  On information and belief, B&N sells Inclusive Access to students in all 43 of those states.

19.     Follett has on-campus college bookstores in 48 states.  On information and belief, Follett sells Inclusive Access to students in all 48 of those states.

20.     The Publisher Defendants sell textbooks and course materials through Inclusive Access to students in all 50 states and the District of Columbia.

21.     The conspiracy herein had a substantial effect on the national market for college textbooks, including the national market for college course materials subject to Inclusive Access programs.

## PARTIES

22.     Plaintiff Tyler Aliperto is a resident of North Saint Paul, Minnesota.  During the relevant time period, he was required to purchase and did purchase course materials through Inclusive Access directly from one or more of the Defendants.

23.     Defendant Barnes & Noble Education, Inc. is a Delaware corporation based in Basking Ridge, NJ that was spun off from Barnes & Noble, Inc. in 2015, and that is the parent company of Barnes & Noble College Booksellers, LLC.

24.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware LLC based in Basking Ridge, NJ that operates Barnes & Noble's campus bookstores nationwide and that sells Inclusive Access course materials through those bookstores.

25.     Defendant Follett Higher Education Group is an Illinois corporation based in Westchester, IL that operates Follett's campus bookstores nationwide and that sells Inclusive Access course materials through those bookstores.

26.     Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, MA that publishes college textbooks and course materials, including through Inclusive Access.

27.     Defendant McGraw Hill LLC is a Delaware LLC based in New York, NY that publishes college textbooks and course materials, including through Inclusive Access.

28.     Defendant Pearson Education, Inc. is a Delaware corporation based in Upper Saddle River, NJ that publishes college textbooks and course materials, including through Inclusive Access.

## FACTUAL ALLEGATIONS

### The Market Prior to Inclusive Access

29.     Before Inclusive Access was created and achieved widespread adoption, students had the option of purchasing either printed, hard-copy course materials or electronic course materials.  Students were instructed to buy the specific textbooks their professor selected for their class and the students could get them from any sources and in any format they wanted. This allowed students to use the method that better fits their unique learning style; some students prefer to work from a print textbook while others prefer a digital version.  It also allowed students to shop around and find the best value.

30.     Students could purchase their course materials from a primary (new, unused textbooks) or secondary (used textbooks) market.  When students buy print textbooks, they have the option to keep it for future use or re-sell it at the end of a semester.

31.     Before Inclusive Access, students also could purchase their course materials from many sources, including official on-campus bookstores, off-campus bookstores in their surrounding communities, out-of-state bookstores through mail order, and online bookstores or sellers, including Amazon and Chegg, or sellers offering course materials on eBay and Craigslist.

### Defendants Experience Decreased Profits

32.     Student spending on textbooks had declined significantly before the creation of Inclusive Access and the conspiracy alleged herein.  Students had numerous alternative sources

to purchase their new or used print or electronic textbooks from, including official on-campus stores, off-campus bookstores and online bookstores or sellers.

33.     The secondary market for used books and alternative sources for new textbooks posed a threat to the profits of Publisher Defendants.  In the secondary market, although official on-campus bookstores sold used textbooks, contracts with the Publisher Defendants typically required that used versions be priced no higher than 75 percent of the cost of a new book. However, used textbooks sold on websites such as Amazon.com, for example, averaged 58% of the price of new textbooks.

34.     This open competition decreased prices for students, but also decreased the profits of the Publisher Defendants.  Students had access to lower-priced used books in the secondary market, and more off-campus and online sellers of new textbooks restrained the Publisher Defendants' ability to increase prices of new books sold at on-campus stores.

35.     The Publisher Defendants' and Retailer Defendants' response to this increased competition was the collusive creation and implementation of Inclusive Access to exclude competition and raise prices.

36.     Defendants' Inclusive Access scheme, as described herein, has allowed them to reverse the decline in profits and allowed them to increase their profits in the Inclusive Access sector by monopolizing the market for Inclusive Access textbooks and charging supracompetitive prices.

37.     The Publisher Defendants have a market share of approximately 80-90% in the primary market for textbooks.

38.     The Retailer Defendants run the majority of official on-campus bookstores in the United States, and nearly two-thirds of college and graduate students in the United States attend institutions where a Retailer Defendant operates the on-campus bookstore.

39.     The amount of money the Retailer Defendants pay to operate an institution's official bookstore has risen considerably in recent years, and it can reach millions of dollars for the largest colleges.  This reflects the profitability of Inclusive Access to the Retailer Defendants.

**Defendants' Implementation of Inclusive Access**

40.     The Defendants furthered their conspiracy through the creation and operation of trade associations.

41.     In 2016 the Publisher Defendants formed Educational Publishers Enforcement Group ("EPEG") with the purported purpose of fighting textbook counterfeiting.  The actual purpose, however, was to facilitate the Publisher Defendants ability to communicate with one another in implementing the Inclusive Access scheme, and to impose pretextual anti-counterfeiting policies that restrict competition for textbooks.  All three Publisher Defendants are members of EPEG and have been since its inception.

42.     EPEG developed EPEG Guidelines, which were allegedly designed to fight counterfeiting.  In actuality, these Guidelines limited which retailers are allowed to sell textbooks by arbitrarily designating off-campus and online booksellers to be in violation or not compliant.  This helped the Publisher Defendants control the market.

43.     EPEG created a "white list" of acceptable retailers, and encouraged its membership to refuse to sell to anyone not on the white list as a means of reducing competition from off-campus and online sellers, despite the fact that the vast majority of those sellers were simply selling used textbooks and were not engaged in counterfeiting.

44. The National Association of Collegiate Stores (NACS) was a trade association that formerly allowed any textbook retailers to participate, including both the Retailer Defendants and other retailers. The Publisher Defendants would participate in NACS events as non-voting members, further enabling their collusion with the Retailer Defendants. On April 1, 2019, NACS voted to exclude all textbook retailers that do not operate on-campus stores, removing retailers other than the Retailer Defendants and stores that are operated by the institutions themselves. This has allowed NACS to function in furtherance of collusion rather than as a legitimate trade association representing the interests of all textbook retailers.

**Inclusive Access**

45. Students who register for courses using Inclusive Access receive access to an online version of the textbook. Often, this includes materials like reading assignments and homework problems needed to pass the course that are not available except through Inclusive Access. Their access to course materials expires after the semester is over or a defined period of time. Students are often automatically subscribed to Inclusive Access materials and are automatically billed for them on their tuition bills.

46. Students are typically unable to purchase Inclusive Access materials from any other source because the Publisher Defendants refuse to sell them to off-campus bookstores or online bookstores.

47. Students are effectively required to purchase the Inclusive Access course materials in order to obtain necessary reading assignments and homework problems in order to pass the course.

48. Although Federal law technically gives students the legal right to opt-out of purchasing Inclusive Access materials, Defendants' conspiracy ensures that those materials are

not available from other sources.  Thus, any student opting out of buying Inclusive Access materials would not be able to do the necessary reading assignments and homework problems and would be at a major disadvantage in the class, if not unable to pass the class at all.  In some cases, a student who opts out of Inclusive Access is required to certify that they will purchase the Inclusive Access materials elsewhere, even though they are usually not available from other sources.

49.     The effect of Inclusive Access is to exclude any competition for textbook purchases by eliminating the secondary market and eliminating other sources for students to purchase  Inclusive Access materials– students' only option is mandated purchases of Inclusive Access course materials from the Publisher Defendants and (at the majority of campuses where Retailer Defendants operate the official on-campus bookstore) the Retailer Defendants.

50.     The Publisher Defendants will not sell Inclusive Access course materials to retailers other than official on-campus bookstores that are operated by the Retailer Defendants or the institution itself.  On campuses where the official on-campus bookstore is operated by a Retailer Defendant, Inclusive Access is an exclusive arrangement between the Publisher Defendants, the Retailer Defendant, and the university.

51.     License agreements between each Publisher Defendant, the Retailer Defendant, and the university require that the Publisher Defendant will only sell Inclusive Access materials at that university through the Retailer Defendant that operates the official on-campus bookstore. These license agreements are nearly identical to one another, further evidence of collusion between Defendants to impose the Inclusive Access program.

52.     There are also direct exclusivity agreements between each Publisher Defendant and each Retailer Defendant, which are operative when there is not a license agreement

involving an institution where a Retailer Defendant operates, that also set forth that the Publisher Defendant will not sell Inclusive Access materials to retailers other than the Retailer Defendant on the campuses where it operates.  This allows for rapid expansion of the Inclusive Access system, because it does not require a formal license agreement to be executed with each university.

53.     When the official on-campus bookstore is run by the institution itself, Inclusive Access is an exclusive arrangement between the Publisher Defendants and the university.

54.     Defendants have refused to sell Inclusive Access materials to retailers other than the Retailer Defendants or on-campus bookstores run by universities.  The Publisher Defendants have either stated that they have an exclusive arrangement with the Retailer Defendant or college-run on-campus store, or that the Inclusive Access materials could not be made available in a format that would allow those off-campus or online retailers to resell them.

55.     The Publisher Defendants have refused to sell Inclusive Access course materials to off-campus retailers in numerous college communities, including retailers near Dona Ana Community College, Eastern Kentucky University, the University of New Mexico, New Mexico State University, the University of North Texas, and the University of Texas Arlington that sought to sell Inclusive Access course materials for those colleges.  In the rare cases where the Publisher Defendants did sell Inclusive Access course materials to off-campus retailers, this was only done after legal intervention.  And, the materials were sold at a substantially higher price than they were sold to the Retailer Defendants or to college-run on-campus bookstores.  This placed the off-campus retailers at a competitive disadvantage relative to the Retailer Defendants or college-run on-campus bookstores for sales.

56.     Despite Defendants' claims that Inclusive Access has technological advantages, it merely offers the same textbooks and course materials that were available before, but in a restricted electronic-only format available for a limited time.   Moreover, a study by the Tennessee Board of Regents comparing student performance before and after the use of Inclusive Access found that the percentage of students who obtained a grade of at least "C" actually declined in a majority of courses after switching to Inclusive Access.

57.     The Publisher Defendants have also claimed that Inclusive Access lowers students' costs.  However, while the cost may in some cases be lower than the list price of new versions of the Inclusive Access textbooks (which is set by the Publisher Defendants and can be artificially inflated to make it appear that Inclusive Access is a bargain), it is far higher than the price that would exist in a market with competition from used books, off-campus retailers, and online retailers and sellers.

58.     For example, at UCLA, the Inclusive Access price of N. Gregory Mankiw's *Principles of Economics* is $108.98.  The same textbook can be rented for $34.51 on Amazon or Chegg.  At Ohio State, students taking Chemistry 1250/General Chemistry for Engineers are required to buy Chemistry: The Central Science (14th Ed.), which has a list price of $98.00, with students able to buy the book through Inclusive Access for $41.62.  If students were allowed to shop outside of Inclusive Access, they could see prices of $25 for used copy and $15 for a rental.

59.     Production costs are far lower for digital versions of books than for physical versions.  With open competition, the cost of electronic versions of textbooks would be lower still.  For Barnes and Noble Education, gross margins in its digital segment are over 80% as compared to 20% in its standard retail segment, which includes college bookstore sales of physical textbooks.

60.     The Publisher Defendants' executives have stated their intention to eliminate the used book market. Cengage CEO Michael Hansen has been quoted saying that the rental book market, for example, is "a market that should fall by the wayside if we do our job the right way."

61.     McGraw-Hill CEO Nana Banerjee stated: "[a]nd there is a half-life that is associated with kind of taking out this used secondary market book enterprise that really has been a disruptor for us."

62.     Economists have shown that in other industries, eliminating a secondary market can increase the profits of the firms who produce the primary product by 50% or more. One study found that the Publisher Defendants' profits would increase by 42.6% if they could close down the secondary market.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as representatives of a Class defined as follows:

> All students at colleges or graduate schools in the United States who were required to purchase textbooks or course materials through Inclusive Access. Excluded from the Class are Defendants and their employees.

64.     The members of the Class are so numerous that joinder is impracticable. The exact number of members of the Class is unknown at this time. However, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are thousands (if not millions) of members of the Class and that their identities can be readily ascertained from records in the possession of the Defendants.

65.     There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, *inter alia*:

a.      Whether the Publisher Defendants and Retailer Defendants colluded to create, promote, and maintain the Inclusive Access system;

b.      Whether the Publisher Defendants colluded with college-run campus bookstores to create, promote, and maintain the Inclusive Access system on those campuses;

c.      Whether the Publisher Defendants colluded among themselves to fix and raise the price of textbooks and course materials under the Inclusive Access system;

d.      Whether the Publisher Defendants refused to deal with independent retailers who sought to sell Inclusive Access course materials;

e.      The time period, number of universities, and number of students affected by the Inclusive Access system;

f.      Whether the Publisher Defendants had market power in the market for college textbooks and course materials subject to Inclusive Access;

g.      Whether the Publisher Defendants substantially foreclosed competition in the market for college textbooks and course materials subject to Inclusive Access;

h.      Whether the Retailer Defendants had monopoly power in the market for college textbooks and course materials subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

i.      Whether Inclusive Access has a legitimate pro-competitive justification;

j.      Whether Plaintiff and the Class suffered injury as a result of the Defendants' actions, and if so, the extent of those damages;

k.      Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Publisher Defendants' market power in the market for college textbooks and course materials subject to Inclusive Access;

l.      Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Retailer Defendants' monopoly power in the market for college textbooks and course materials subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

m.      Whether the actions of the Publisher Defendants as described herein were a violation of the Sherman Act;

n.      Whether the actions of the Retailer Defendants as described herein were a violation of the Sherman Act;

o.      The operative time period and extent of Defendants' antitrust violations;

p.      The appropriate injunctive and equitable relief for the Class; and

q.      The appropriate measure of damages for the Class.

66.      Plaintiff's claims are typical of, and not antagonistic to, those of other or absent members of the Class.

67.      Plaintiff will fairly and adequately represent and protect the interests of the Class.

68.      Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions.

69.     If individual Class members prosecuted many separate actions, there would be a risk that the outcomes of those actions would be inconsistent with one another.

70.     Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

71.     The Class is ascertainable in that the Retailer Defendants would have records of the students who were required to purchase textbooks and course materials subject to Inclusive Access on the campus bookstores that they operate, and college-run bookstores with Inclusive Access would have similar records.

72.     Class treatment would allow Class members who have comparatively small claims to prosecute those claims, instead of finding it uneconomical to do so.

73.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**RELEVANT MARKET**

74.     Plaintiff alleges that Defendants' conduct was *per se* illegal: the Publisher Defendants and Retailer Defendants (1) colluded to establish and operate the Inclusive Access system in order to restrict the supply of textbooks and monopolize the market for course materials so that they could raise prices, and (2) have effectively established a group boycott to prevent Inclusive Access materials from being sold through any other sources.

75.     However, assuming *arguendo* that Plaintiff's allegations fall within the rule of reason and a relevant market definition is required to be pled: the relevant product market is the

17

market for textbooks and course materials for courses utilizing Inclusive Access (the "Inclusive Access Market").

76.     The Inclusive Access conspiracy by Defendants seeks to use Inclusive Access to eliminate competition from new textbooks, used textbooks, and other electronic versions of textbooks, and from other online and physical textbook sellers.

77.     On information and belief, the Publisher Defendants have a market share of over 90% in the Inclusive Access Market.

78.     While a student is required to purchase an ordinary textbook, the price of used and electronic versions of that textbook does constrain the price of new textbooks, and the availability of multiple sellers for any given textbook constrains the ability of an official on-campus bookstore to raise prices.

79.     The Inclusive Access Market is a product market consisting only of Inclusive Access course materials.   There are no substitutes for Inclusive Access textbooks.   The availability of new or used textbooks does not constrain the price of Inclusive Access textbooks, because students are not allowed to use those textbooks in place of the Inclusive Access textbooks.   Inclusive Access textbooks can only be purchased from official on-campus retailers, whether run by the Retailer Defendants or by a college itself.   Inclusive Access textbooks are generally not available from any other source, or in the rare instances when they are, they are more expensive.   Therefore, the isolated availability of Inclusive Access textbooks from other sources does not constrain their price from official on-campus retailers.

80.     At all relevant times, the Publisher Defendants had substantial market power in the Inclusive Access Market.   The Publisher Defendants had the power to maintain the price of

Inclusive Access materials at supracompetitive levels, and to do so profitably without losing substantial sales.

81.    The relevant geographic market is the United States.  The relevant geographic submarkets are the markets for Inclusive Access textbooks at each individual university. Students at one university cannot purchase Inclusive Access textbooks from other universities, and generally cannot purchase them from other sources at all other than their own on-campus bookstore, or in the rare instances when they are available elsewhere, they are more expensive. Therefore, the official on-campus bookstore, whether run by a Retailer Defendant or by a college itself, has an effective total monopoly on the Inclusive Access Market on its own college.

82.    At all relevant times, the Retailer Defendants had substantial market power in the Inclusive Access Market at all colleges in which they operate official on-campus bookstores that have Inclusive Access programs.  The Retailer Defendants had the power to maintain the price of Inclusive Access materials on those campuses at supracompetitive levels, and to do so profitably without losing substantial sales.

83.    The Retailer Defendants have over a 50% market share in the percentage of official on-campus bookstores that they operate, and they serve nearly two-thirds of the nation's college and graduate students, and therefore have a very high market share in the overall Inclusive Access Market.

84.    The Inclusive Access Market is susceptible to collusion due to a small number of dominant publishers, the monopoly position of on-campus bookstores, the captive market of students who need the Inclusive Access textbooks to pass their classes, and high barriers to entry due to Publisher Defendants' and Retailer Defendants' longstanding relationships with textbook authors, professors assigning textbooks, and universities.

85.     If the Defendants' actions are not enjoined, the Inclusive Access Market is likely to take over more and more college textbook and course materials sales, resulting in higher prices and reduced choice for more students on more campuses and in more of their courses.

## ANTITRUST INJURY

86.     The actions by Defendants have harmed Plaintiff and Class Members who attended institutions using Inclusive Access because it effectively forced Plaintiff and Class Members to purchase Inclusive Access Course Materials directly from the Publisher Defendants and/or directly from the Retailer Defendants, at prices that were higher than they otherwise would be if those Course Materials were available in multiple formats and from multiple sources in a truly competitive market.

87.     At colleges that use Inclusive Access whose bookstores are college-run, the Publisher Defendants' actions have forced Class members to purchase Inclusive Access textbooks from only their official college-run bookstore, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market.

88.     Without Inclusive Access, Plaintiff and other Class members would have many options to purchase textbooks, including new and used versions of print textbooks and electronic versions of textbooks, and purchasing from on-campus bookstores, off-campus bookstores, and online sources, including the secondary market, and competition between those options would result in lower prices.

89.     This has injured Plaintiff and other Class members and they have suffered antitrust injury as a result.

## FRAUDULENT CONCEALMENT

90.     The Defendants concealed their conspiracy from Plaintiff and other members of the Class.  The Defendants' actions in developing and implementing the Inclusive Access conspiracy occurred in private communications, including through trade associations that claimed publicly to have other purposes.  The Defendants' public statements promoted Inclusive Access to students and universities as being a technological advance, being cheaper, or being a response to consumer demand, not as a conspiracy to raise prices and increase profits by eliminating competition.

91.     Plaintiff and other members of the Class did not have access to information that would have alerted them to the possibility of the conspiracy between the Publisher Defendants and Retailer Defendants.  A college student instructed that the textbook for a certain course would only be available through Inclusive Access would not reasonably suspect that it was the result of a conspiracy to increase profits by eliminating competition at the students' expense.

92.     In light of the above, the Publisher Defendants' and Retailer Defendants' knowing and active efforts to conceal the conspiracy and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop Defendants from using any statute of limitations defense in this action.

## CAUSES OF ACTION

### COUNT ONE
### Unlawful agreement to restrain trade (15 U.S.C. §1)

93.     Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

94.     The Publisher Defendants colluded to restrain trade in course materials through the Inclusive Access conspiracy described herein: (1) working with the Retailer Defendants and

college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

95. The Retailer Defendants colluded to restrain trade in course materials on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for course materials through Inclusive Access.

96. As a result of the Publisher Defendants and Retailer Defendants' Inclusive Access conspiracy as described herein, Plaintiff and other Class members have had to pay higher prices for course materials as a result of the elimination of competition, and it has therefore caused them injury.

97. Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**COUNT TWO**
**Monopolization (15 U.S.C. §2)**

98.    Plaintiff repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

99.    In the market for Inclusive Access course materials at each individual university that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at universities where they run the official on-campus bookstore) have monopoly power, and acquired that power willfully through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access.

100.    In the market for Inclusive Access course materials at each individual university that uses Inclusive Access, at universities at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants acquired their monopoly power through anticompetitive and exclusionary means: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

101.    In the market for Inclusive Access course materials at each individual university that uses Inclusive Access, at universities where the university runs the official on-campus bookstore, the Publisher Defendants acquired their monopoly power through anticompetitive and exclusionary means: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2)

arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

102.    These actions by the Publisher Defendants and Retailer Defendants have served to create and maintain their monopoly for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

103.    The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiff and other Class members by forcing them to pay higher prices for course materials than they would pay in a competitive market for course materials in the absence of Defendants' anticompetitive Inclusive Access practices.

104.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT THREE
### Attempted Monopolization (15 U.S.C. §2)

105.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

106.    In the market for Inclusive Access course materials at each individual university that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at universities where they run the official on-campus bookstore) engaged in predatory and anticompetitive conduct with the specific intent of monopolizing that market, and with a dangerous probability of monopolizing that market.

107.    In the market for Inclusive Access course materials at each individual university that uses Inclusive Access, at universities at which a Retailer Defendant runs the official on-

campus bookstore, the Publisher Defendants and Retailer Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

108.    In the market for Inclusive Access course materials at each individual university that uses Inclusive Access, at universities where the university runs the official on-campus bookstore, the Publisher Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

109.    There is a dangerous probability that the Publisher Defendants' conduct will in fact monopolize the market for Inclusive Access course materials at universities that use Inclusive Access, and that the Retailer Defendants' conduct will in fact monopolize the market for Inclusive Access course materials at the universities at which they operate the official on-campus bookstores, since through these policies they have excluded all other possible competition from that market.

110.   These actions by the Publisher Defendants (and Retailer Defendants where applicable) are attempted monopolization of the market for Inclusive Access course materials at each such university, in violation of 15 U.S.C. §2.

111.   The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiff and other Class members by forcing them to pay higher prices for course materials than they would pay in a competitive market for course materials in the absence of Defendants' anticompetitive Inclusive Access practices.

112.   Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

### COUNT FOUR
### Conspiracy to Monopolize (15 U.S.C. §2)

113.   Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

114.   The Publisher Defendants colluded to restrain trade in course materials through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access course materials: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for course materials through Inclusive Access.

115.    The Retailer Defendants colluded to restrain trade in course materials on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access course materials on those universities: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for course materials through Inclusive Access.

116.    The Publisher Defendants and Retailer Defendants committed overt acts in furtherance of the conspiracy alleged herein, including entering into exclusivity agreements between Publisher Defendants, Retailer Defendants, and universities, between Publisher Defendants and Retailer Defendants, and between Publisher Defendants and universities.

117.    These actions by the Publisher Defendants (and Retailer Defendants where applicable) are a conspiracy to monopolize the market for Inclusive Access course materials at each such university, in violation of 15 U.S.C. §2.

118.    The Publisher Defendants and Retailer Defendants' conspiracy to monopolize the market for Inclusive Access course materials at each such university in violation of 15 U.S.C. §2 has caused injury to Plaintiff and other Class members by forcing them to pay higher prices for course materials than they would pay in a competitive market for course materials in the absence of Defendants' anticompetitive Inclusive Access practices.

119.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:**

(a)     That the Court determine that Plaintiff's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)     That the Court appoint Plaintiff as the representative of the Class;

(c)     That Plaintiff's counsel be appointed as counsel for the Class;

(d)     That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

(e)     That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

(f)     That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(g)     That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(h)     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Dated:  May 20, 2020

Respectfully submitted,

Stanley O. King
**KING & KING LLC**
231 South Broad Street
Woodbury, New Jersey 08096
Telephone: 856-845-3001
stan@kingslaw.com
Sharon@kingslaw.com

*Local Counsel*

**REINHARDT WENDORF &**
**BLANCHFIELD**
Garrett D. Blanchfield
Brant D. Penney
W-1050 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com